ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL VI

| | | |
|---|---|---|
| LUIS ANÍBAL AVILÉS PAGÁN, en su carácter de abonado y contribuyente del sistema eléctrico de Puerto Rico<br><br>Parte Apelante<br><br><br>v.<br><br><br><br>AUTORIDAD DE LOS PUERTOS DE PUERTO RICO; AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO (PREPA); NEGOCIADO DE ENERGÍA DE PUERTO RICO (NEPR); AUTORIDAD PARA LAS ALIANZAS PÚBLICO-PRIVADAS (AAPP); AUTORIDAD DE ASESORÍA FINANCIERA Y AGENCIA FISCAL (AAFAF); ESTADO LIBRE ASOCIADO DE PUERTO RICO a través del DEPARTAMENTO DE JUSTICIA DE PUERTO RICO – OFICINA DE ASUNTOS MONOPOLÍSTICOS (OAM); THIRD PARTY PROJECT OFFICE (3PPO)<br><br>Parte Apelada | TA2025AP00248 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.:<br><br>SJ2025CV06829<br><br><br>Sobre:<br><br>Mandamus |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y la Jueza Prats Palerm.

Monge Gómez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 22 de septiembre de 2025.

Compareció ante este Tribunal la parte apelante, el Lcdo. Luis Aníbal

Avilés Pagán (en adelante, el "Lcdo. Avilés Pagán" o "Apelante"), mediante

recurso de apelación presentado el 15 de agosto de 2025. Nos solicitó la revocación de la *Sentencia* emitida y notificada por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante, el "TPI"), el 1 de agosto de 2025. Mediante el referido dictamen, el TPI desestimó la "**Demanda de Mandamus**" (en adelante, "Demanda") incoada por el Apelante.

Por los fundamentos que expondremos a continuación, se *confirma* la *Sentencia* apelada.

**I.**

El caso de epígrafe se originó el 30 de julio de 2025, a raíz de la *Demanda* presentada por el Lcdo. Avilés Pagán en contra de la Gobernadora de Puerto Rico, Hon. Jenniffer González Colón; el director ejecutivo de la Autoridad de Asesoría Financiera y Agencia Fiscal (en adelante, "AAFAF"), Lcdo. Francisco J. Domenech; la directora ejecutiva de la Autoridad de Energía Eléctrica (en adelante, "AEE"), Ing. Mary Carmen Zapata Acosta; la Secretaria del Departamento de Justicia del Gobierno de Puerto Rico, Hon. Lourdes Lynnette Gómez Torres; el director ejecutivo de la Autoridad de los Puertos de Puerto Rico, Lcdo. Norberto Negrón Díaz; el Presidente del Negociado de Energía de Puerto Rico (en adelante, "NEPR"), el Lcdo./ Ing. Edison Avilés Deliz; y el director de *Third Party Procurement Office* (en adelante, "3PPO"), Lcdo. Osvaldo Carlo Linares, (en adelante y en conjunto, "los Apelados"). Mediante la misma, expresó que, el 3 de mayo de 2018, la Autoridad de los Puertos suscribió con NFE Energía, LLC (en adelante, "NFE") un contrato de arrendamiento mediante el cual se concedió a esta empresa el uso exclusivo y libre de interferencias de los muelles A y B del Puerto de San Juan, por un término de veinte (20) años, con el fin de diseñar, construir y operar una instalación destinada a la descarga y regasificación de gas natural licuado.

Sostuvo que la cláusula 5.01 del referido contrato infringió los Artículos 2 y 6 de la Ley Núm. 125 de 7 de mayo de 1942, según enmendada, conocida como la "Ley de la Autoridad de los Puertos de Puerto Rico", 23 LPRA secs. 331 *et seq.*, los cuales obligan a dicha entidad a administrar las facilidades portuarias fomentando la libre competencia y

previniendo prácticas de índole monopolística. Planteó que el contrato no fue sometido a la consideración del NEPR ni de la Oficina de Asuntos Monopolísticos del Departamento de Justicia, a pesar de sus repercusiones estructurales en el mercado energético. Arguyó, además, que el director del NEPR incumplió con su deber de evaluar dicho acuerdo. Señaló también que, entre 2019 y 2020, NFE diseñó, construyó y puso en operación su planta de descarga y regasificación de gas natural licuado en los muelles A y B del Puerto de San Juan, sin contar con la autorización previa exigida por la sección 717f del *Natural Gas Act*. Destacó que el 24 de marzo de 2021, la *Federal Energy Regulatory Commission* (en adelante, "FERC") dictó una *Orden* mediante la cual ordenó a NFE a exponer las razones de su incumplimiento y radicar, con carácter retroactivo, la solicitud de la licencia correspondiente.

Manifestó que, a pesar de la referida *Orden* federal, la instalación continuó operando sin interrupción y con la anuencia tácita del Gobierno de Puerto Rico. Expresó, además, que la Autoridad de los Puertos omitió activar la cláusula 15 del contrato de arrendamiento, la cual le facultaba rescindir o suspender las operaciones ante incumplimientos regulatorios. En consecuencia, alegó que el director de la Autoridad de Puertos omitió ejercer su deber ministerial respecto a la *Orden* emitida por la FERC.

Arguyó que, el 21 de mayo de 2019, la Autoridad de Energía Eléctrica (en adelante, "PREPA") formalizó un contrato de compraventa de gas natural con NFE, cuyo objeto consistió en el suministro de gas natural licuado a las unidades 5 y 6 de la Central San Juan. Subrayó que dicho contrato incorporó cláusulas de tipo *"take or pay"*, estableció penalidades automáticas frente a un eventual incumplimiento por parte de PREPA y omitió exigir una fianza de cumplimiento al proveedor. Añadió que el acuerdo fue negociado y ejecutado sin la celebración de un proceso competitivo abierto y que, además, no fue sometido a la revisión ni obtuvo la aprobación del NEPR, a pesar de que el Artículo 6.27(b)(iii) de la Ley Núm. 57-2014, según enmendada, conocida como la "Ley de Transformación y ALIVIO Energético", 22 LPRA secs. 1051 *et seq.*, imponía

la obligación de referir a dicho ente regulador todo contrato de combustible con vigencia superior a un (1) año. En consecuencia, sostuvo que tanto el director de PREPA como el del NEPR incumplieron con los deberes ministeriales que les correspondían.

Asimismo, expuso que, el 14 de julio de 2025, NFE notificó la suspensión de las entregas de gas natural licuado hasta que PREPA efectuara el pago de nueve (9) millones de dólares, más tres (3) millones adicionales en concepto de intereses, que según la referida compañía estaban en mora desde el año 2020. Afirmó que tal suspensión resultó en contravención de la Sección 9.1 del *Fuel Supply and Purchase Agreement* de 2019, la cual imponía a NFE la obligación absoluta de mantener el suministro de gas durante la vigencia del contrato. Alegó que, pese a la magnitud del incumplimiento, PREPA omitió invocar la cláusula 15.2 relativa a la terminación inmediata por incumplimiento, ni emitió el aviso de *default* correspondiente, lo que prolongó el perjuicio económico y reputacional ocasionado. En consecuencia, sostuvo que el director ejecutivo de PREPA incurrió en incumplimiento de los deberes ministeriales que le eran exigibles.

Señaló que el Informe Mensual de LUMA evidenció que, para abril de 2024, la Autoridad de Energía Eléctrica pagó un promedio de veintiún dólares ($21.00) por MMBtu de diésel, mientras que el gas natural licuado adquirido en ese mismo mes tuvo un costo de únicamente nueve dólares con setenta y nueve centavos ($9.79) por MMBtu. Adujo que la inacción de los Apelados tendría como efecto encarecer sustancialmente el costo del combustible, lo cual se traduciría en incrementos en la factura de los bonistas. Añadió que las unidades de San Juan 5 y 6 cuentan con una capacidad combinada de cuatrocientos cuarenta (440) MW y, considerando un factor de planta de sesenta por ciento (60%) y una tasa de calor de 10,000 Btu/kWh, consumen aproximadamente 1.9 millones de MMBtu al mes.

Indicó que el diésel genera mayores niveles de hollín y óxidos de nitrógeno en comparación con el gas natural licuado, lo que impone la

necesidad de realizar limpiezas frecuentes de calderas y ajustes constantes en los quemadores. Arguyó que cada diez (10) millones de dólares adicionales en gasto mensual por concepto de combustible encarecen la cláusula de ajuste en aproximadamente 0.6 centavos. Explicó que, para un hogar promedio con un consumo mensual de ochocientos (800) kWh, ello se traduce en un incremento de entre cuatro $4.00 a $5.00 en la factura eléctrica. Añadió que la única alternativa compatible con el deber de lealtad fiduciaria de PREPA hacia sus abonados consiste en resolver el contrato, cuantificar los daños y convocar de inmediato un proceso competitivo para el suministro de gas natural licuado bajo la supervisión del NEPR.

Explicó que, durante los meses de abril y mayo de 2025, la Autoridad para las Alianzas Público-Privadas (en adelante, "AAPP") y el 3PPO publicaron un pliego preliminar de solicitud de propuestas (en adelante, "RFP"). Indicó que dicho borrador imponía a los licitadores, entre otras garantías, la constitución de un *performance bond* equivalente al menos entre cien millones de dólares ($100,000,000.00) o seis (6) meses de pagos, lo que representaba aproximadamente cincuenta millones de dólares ($50,000,000.00) para el bloque base. Además, señaló que establecía penalidades liquidadas equivalentes al cinco por ciento (5%) del valor anual, con un término contractual máximo de diez (10) años, sujeto a la opción de reducción a cinco (5) años. Destacó que, mediante la *Addenda* Núm. 5, emitida el 24 de junio de 2025, el 3PPO modificó de manera abrupta y sin consulta pública dichas condiciones, a saber: (1) la fianza de ejecución se redujo a un monto fijo de diez millones de dólares ($10,000,000), (2) se eliminó la *payment bond*, (3) las penalidades se recortaron a 0.5% del valor anual y (4) el plazo se extendió hasta quince (15) años.

Expuso que únicamente trece (13) empresas retiraron el pliego y que, al momento del cierre, solo dos completaron la precalificación: NFE para todas las unidades y Crowley LNG Puerto Rico, LLC, para la terminal de Mayagüez. De este modo, NFE resultó ser el único oferente efectivo

para aproximadamente el noventa por ciento (90%) del volumen solicitado. Sostuvo que la comunicación sobre la reducción de garantías, la disminución de penalidades y la extensión del plazo contractual se dirigió exclusivamente a dichos dos participantes, en contravención del Artículo 6(b)(ii) de la Ley Núm. 29-2009, según enmendada, conocida como la "Ley de Alianzas Público-Privadas" 27 LPRA secs. 2601 *et seq*, que impone la obligación de llevar a cabo procedimientos competitivos en condiciones de igualdad y con estricta transparencia.

Por último, sostuvo que el director ejecutivo de la Autoridad de los Puertos incurrió en omisión de su deber de salvaguardar el interés público y de evitar barreras de entrada en instalaciones esenciales, en contravención de la Ley Núm. 125-1942, *supra*. Señaló que la directora ejecutiva de PREPA faltó gravemente a su deber de contratar mediante procedimientos competitivos y de resolver contratos frente a incumplimientos sustanciales, conforme a la Ley Núm. 57-2014, *supra*. Atribuyó al presidente del Negociado de Energía la omisión manifiesta de revisar y aprobar contratos de combustible, conforme a lo dispuesto en el Artículo 6.27(b)(iii) de la Ley Núm. 57-2014, *supra*. Destacó que, por la inacción de los señores Josué Colón y Osvaldo Carlo, la AAPP y el 3PPO infringieron su deber legal, impuesto por la Ley Núm. 29-2009, *supra*, de garantizar procesos competitivos, transparentes y debidamente fiscalizados. Afirmó, además, que, por la inacción de su director ejecutivo, la AAFAF omitió ejercer su rol de asegurar la coherencia fiscal y la compatibilidad contractual con el plan fiscal vigente. Finalmente, sostuvo que, por la inacción de la Gobernadora de Puerto Rico y de la Secretaria de Justicia, la Oficina de Asuntos Monopolísticos del Departamento de Justicia dejó de iniciar la investigación correspondiente, pese a la consolidación monopólica reconocida por la Junta de Supervisión Fiscal y a la evidencia pública de que los contratos carecieron de competencia efectiva.

En vista de lo anterior, le solicitó al Tribunal que ordenara a los directivos de las agencias e instrumentalidades apeladas a cumplir con los

deberes señalados en la *Demanda*, fijara un término común y razonable para la presentación de un plan interagencial de cumplimiento, decretara la suspensión de toda negociación o contrato con NFE/Genera PR hasta tanto dicho plan fuese aprobado y verificado su ejecución, y se reservara jurisdicción continua para imponer sanciones por desacato.

En detalle, solicitó al foro de instancia que la Autoridad de los Puertos suspendiera de inmediato las operaciones de regasificación en los muelles A y B y que, en un plazo de treinta (30) días, emitiera una determinación sobre la rescisión del contrato A-029-2018 o la imposición de penalidades. Peticionó que la PREPA rescinda el contrato de suministro de gas de 2019 con NFE por incumplimiento material, se abstenga de formalizar el acuerdo multianual de quince (15) años y colabore con el NEPR y el 3PPO en el diseño de un modelo contractual de transición. Asimismo, pidió que el NEPR ejerza su autoridad regulatoria para revisar retroactivamente y declarar nulo dicho contrato, que la AAPP y el 3PPO cancelen el RFP de abril de 2025 y convoquen un proceso interino competitivo, y que la AAFAF emita una determinación expresa sobre la incompatibilidad fiscal del contrato propuesto con el plan fiscal vigente de PREPA. Finalmente, solicitó al Tribunal que la Gobernadora de Puerto Rico y la Secretaria de Justicia, mediante la Oficina de Asuntos Monopolísticos, inicien una investigación formal contra NFE por consolidación monopólica y evalúen posibles actos de colusión administrativa en la adjudicación de contratos.

Así las cosas, el 30 de julio de 2025, el Apelante presentó un "**Memorando de Derecho en Apoyo a la Demanda de Mandamus**" (en adelante, "Memorando") en el que reiteró los planteamientos expuestos en su *Demanda* y destacó que, en el presente caso, se configuró un esquema de omisiones institucionales múltiples que, de no ser corregido con premura por el Poder Judicial, consolidará un monopolio energético *de facto* en manos de una sola empresa privada, NFE y sus afiliadas, mediante una red de contratos carentes de evaluación competitiva, revisión regulatoria y garantía alguna de beneficio para el interés público. Indicó que su recurso

persigue restablecer condiciones mínimas de competencia, transparencia y legalidad en torno a una infraestructura crítica, a saber, el terminal de gas natural licuado de los muelles A y B del Puerto de San Juan, que ha sido convertido en instalación esencial sin reglas de acceso abierto ni canon uniforme para terceros.

Argumentó que las leyes habilitadoras de las agencias apeladas les imponían deberes concretos, tales como: (1) contratar mediante subastas competitivas, (2) revisar los contratos de combustible que excedieran un año, (3) garantizar el acceso abierto en instalaciones públicas esenciales, (4) investigar la concentración monopólica en mercados regulados y (5) realizar la revisión fiscal de todo contrato de alto impacto económico. Alegó que la omisión de dichos deberes permitió la configuración de un esquema contractual que posiciona a NFE como único proveedor de gas natural para el noventa por ciento (90%) del volumen solicitado, bajo contratos de hasta quince (15) años, con cláusulas *take or pay* y fianzas reducidas de forma irregular. Añadió que, aun si NFE se retirara, el monopolio de hecho persistiría mientras no se reformulen los criterios de adjudicación y participación. En consonancia con lo anterior, le peticionó al TPI que: (1) expida el auto de *mandamus*, (2) declare nulas las actuaciones administrativas y contractuales realizadas en contravención de los deberes ministeriales, (3) ordene la suspensión de toda ejecución contractual relacionada mientras se dilucida la acción y (4) conceda cualquier otro remedio que en derecho proceda.

Posteriormente, el 30 de julio de 2025, el Lcdo. Avilés Pagán presentó una "**Moción Solicitando Vista Urgente**" mediante la cual reafirmó que el recurso de *mandamus* persigue que los Apelados den cumplimiento inmediato a sus deberes ministeriales y regulatorios, a fin de evitar la consolidación de un monopolio energético ilegal y gravemente perjudicial al interés público. Señaló que cada día de inacción provoca que PREPA mantenga la operación de unidades críticas exclusivamente con diésel, generando sobrecostos, mayores emisiones y un aumento en el riesgo de apagones, en violación de la Ley Núm. 57-2014, *supra*, y de las

obligaciones contractuales vigentes. En atención a ello, le solicitó al TPI la celebración de una audiencia urgente dentro de un término no mayor de diez (10) días para atender la *Demanda* y evaluar medidas provisionales inmediatas, así como la expedición de una orden de mostrar causa a los Apelados, para que comparecieran y explicaran por qué no debía concederse el remedio solicitado, incluyendo la suspensión de contratos, licitaciones y operaciones con NFE/Genera PR.

Más adelante, el 1 de agosto de 2025, el Lcdo. Avilés Pagán presentó una "**Demanda de Mandamus Enmendada**" con el propósito de excluir al director ejecutivo de AAPP, Ing. Josué Colón Ortiz, como codemandado. Ese mismo día, el TPI dictó *Sentencia* desestimando la *Demanda* concluyendo que el orden cronológico de los hechos y sus resultados resultaban incompatibles con el recurso de *mandamus*. Determinó que los contratos formalizados por las agencias y corporaciones públicas en años anteriores no podían ser cuestionados mediante dicho recurso, ya que el mecanismo procesal idóneo era la sentencia declaratoria prevista en la Regla 59 de Procedimiento Civil, 32 LPRA Ap. V, R 59. Añadió que los procesos de licitación y asuntos relacionados en meses y días recientes tampoco justificaban la intervención mediante *mandamus*, destacando además que se trataba de procedimientos que aún se encontraban en diferentes fases administrativas.

Inconforme con lo anteriormente resuelto, el Apelante acudió ante este Tribunal de Apelaciones mediante el recurso de epígrafe, en el que señaló la comisión de los siguientes errores:

> PRIMER ERROR: Erró el TPI al desestimar la Demanda de Mandamus sin atenerse a los procedimientos de rigor y en violación del derecho del compareciente a tener su día en corte; denegar el recurso de mandamus sin emitir auto alternativo ni celebrar vista, en contravención de la Regla 54 de Procedimiento Civil, y a pesar de que el recurso no adolecía de defecto de forma alguno.

> SEGUNDO ERROR: Erró el TPI al prejuzgar que el recurso de *mandamus* pretendía la nulidad retroactiva de contratos ya firmados, y al determinar, que la vía procesal adecuada era una petición de sentencia declaratoria y no un recurso de mandamus.

TERCER ERROR: Erró el TPI al prejuzgar que el daño alegado era un evento consumado e irreparable, cuando la Demanda claramente alega que se trata de     en     realidad se trata de un daño continuo que se renueva con cada operación exclusiva en los muelles controlados por NFE, lo cual justifica la procedencia del recurso de mandamus. El Apelante cuestiona la validez de ciertos contratos de agencias públicas como la autoridad de Puertos, y el Tribunal desestimó el mandamus bajo el fundamento de que el mecanismo  de sentencia declaratoria contemplado en la Regla 59 de Procedimiento Civil es el adecuado.

El 15 de septiembre de 20205, comparecieron la Autoridad de Asesoría Financiera y Agencia Fiscal ("AAFAF") por sí y en representación de la Autoridad de los Puertos de Puerto Rico ("Autoridad de Puertos"), la Autoridad de Energía Eléctrica de Puerto Rico ("AEE"), la Autoridad para las Alianzas Público Privadas ("AAPP") y el Gobierno de Puerto Rico mediante "**Alegato en Oposición a Recurso de Apelación**".

Por su parte, el 19 de septiembre de 2025, el Negociado de Energía de la Junta Reglamentadora de Servicio Público de Puerto Rico presentó "**Moción de Desestimación**".

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**A.**

El *mandamus* es un recurso que se expide para ordenar a una persona o personas naturales, corporación o tribunal de inferior jerarquía a cumplir o efectuar una actuación que forma parte de sus deberes o facultades. Carrasquillo Román v. Inst. Correccional, 204 DPR 699, 713 (2020); Art. 649 del Código de Enjuiciamiento Civil, 32 LPRA sec. 3421. Su expedición es de carácter discrecional y su procedencia dependerá del tipo de acto que se pretenda ejecutar. Báez Galib y otros v. C.E.E. II, 152 DPR 382, 391-392 (2000). "[S]ólo procede para ordenar el cumplimiento de un deber ministerial, que no admite discreción en su ejercicio, cuando no hay otro mecanismo en ley para conseguir dicho remedio". Acevedo Vilá v. Aponte Hernández, 168 DPR 443, 454-455 (2006). Este recurso extraordinario "no procede cuando hay un remedio ordinario dentro del curso de ley, porque el objeto del auto no es reemplazar remedios legales

sino suplir la falta de ellos". <u>AMPR v. Srio. Educación, E.L.A.</u>, 178 DPR 253, 266-267 (2010).

La petición de *mandamus* debe ser evaluada a la luz de varios requisitos, a saber: (1) que el demandado tenga un deber u obligación ministerial impuesto por ley; (2) que el peticionario tenga un interés especial en el derecho que reclama; (3) que el deber de actuar de la agencia y el derecho del peticionario surjan de la ley de forma clara y patente; (4) que el peticionario no tiene otro remedio legal para hacer valer su derecho; y (5) que el tribunal entienda que los fines de la justicia obligan a su expedición, luego de estimar el efecto que tendrá la expedición del auto. 32 LPRA secs. 3421-3423.

Por ello, "[s]u expedición no se invoca como cuestión de derecho, sino que descansa en la sana discreción del foro judicial". <u>Carrasquillo Román v. Inst. Correccional</u>, *supra*, pág. 713. Cónsono con lo anterior, el deber ministerial que se invoca por vía del *mandamus* no puede tratarse de "una directriz o una disposición que permite hacer algo, sino de un mandato específico que la parte demandada no tiene opción para desobedecer". <u>Íd</u>.

**B.**

La Regla 59 de Reglas de Procedimiento Civil aborda lo relativo a las sentencias declaratorias. En específico, la Regla 59.1 de Procedimiento Civil establece que, en los casos en que proceda dictar sentencia declaratoria, el Tribunal de Primera Instancia está facultado para declarar derechos, situaciones jurídicas y demás relaciones legales, aun cuando se haya solicitado o pueda solicitarse otro remedio. 32 LPRA Ap. V, R. 59.1. Dispone, además, que la petición de una resolución o sentencia declaratoria no constituye motivo suficiente para impugnar un procedimiento o acción. <u>Íd</u>. Establece que la declaración podrá adoptar forma y efectos afirmativos o negativos, y tendrá la misma fuerza y eficacia que una sentencia o resolución definitiva. <u>Íd</u>. Asimismo, faculta al tribunal, independientemente de lo dispuesto en la Regla 37 de dicho cuerpo reglamentario, a señalar con carácter preferente una vista expedita en los pleitos de sentencia declaratoria. <u>Íd</u>.

El mecanismo de sentencia declaratoria ha sido caracterizado como uno de naturaleza remedial y profiláctica, en tanto faculta a los tribunales a anticipar la adjudicación de los méritos de una reclamación. Beltrán Cintrón *et al.* v. ELA *et al*, 204 DPR 89, 109 (2020); Senado de PR v. ELA, 203 DPR 62, 71 (2019); Alcalde de Guayama v. ELA, 192 DPR 329, 333 (2015). Entiéndase que, la sentencia declaratoria constituye un mecanismo que permite definir los derechos de las partes frente a una posible causa de acción futura. Ahora bien, para que proceda su utilización, debe concurrir un peligro potencial que amenace a la parte que la promueve. Beltrán Cintrón *et al.* v. ELA *et al, supra*, pág. 109; Senado de PR v. ELA, *supra*, pág. 71; Alcalde de Guayama v. ELA, *supra*, pág. 333.

Es menester destacar que la persona que solicite la sentencia declaratoria debe tener legitimación activa para poder proceder y quedará sujeta al cumplimiento de los criterios de esta doctrina. A esos efectos, debe demostrar que: (1) ha sufrido un daño claro y palpable; (2) el daño es real, inmediato y preciso, y no uno abstracto e hipotético; (3) existe conexión entre el daño sufrido y la causa de acción ejercitada y (4) la causa de acción surge bajo el palio de la Constitución o de una ley. Mun. Fajardo v. Srio. Justicia et al., 187 DPR 245, 254-255 (2012). Esto significa que el daño cuya prevención se persigue debe ser real o inminente y no meramente hipotético, aun en ausencia de una lesión previa. Romero Barceló v. E.L.A., 169 DPR 460, 475 (2006). Además, la controversia planteada debe ser justiciable, por lo que no puede ser abstracta, académica, especulativa, remota o teórica. Íd.

Por último, la precitada Regla confiere al tribunal un margen de discreción. En virtud de ello, el foro judicial puede rehusar dictar o registrar una sentencia declaratoria cuando tal determinación no tenga el efecto de poner fin a la incertidumbre o a la controversia que dio lugar al procedimiento. 32 LPRA Ap. V, R. 59.3.

**III.**

En el presente caso, el Lcdo. Avilés Pagán nos solicitó la revocación de la *Sentencia* del TPI mediante la cual se desestimó la *Demanda* que había presentado.

Los señalamientos de error esgrimidos están íntimamente relacionados, por lo que se abordarán de manera conjunta en la discusión. En síntesis, el Apelante sostiene que el TPI erró al: (1) desestimar la *Demanda* sin atenerse a los procedimientos de rigor y en violación de su derecho a tener su día en corte: (2) al prejuzgar que el recurso de *mandamus* pretendía la nulidad retroactiva de contratos ya firmados, (3) al determinar que la vía procesal adecuada era una petición de sentencia declaratoria, (4) al prejuzgar que el daño alegado era un evento consumado e irreparable cuando de la *Demanda* se desprende que se trata de un daño continuo que se renueva con cada operación exclusiva en los muelles controlados por NFE, (5) al pasar por alto que las disposiciones legales invocadas, incluyendo el Artículo 6.3 de la Ley Núm. 17-2019 y las de la Ley Núm. 57-2014, *supra*, constituyen meras exhortaciones, en lugar de mandatos jurídicos que imponen deberes ministeriales claros al NEPR. Veamos.

Del expediente ante nuestra consideración se desprende que el 30 de julio de 2025, el Lcdo. Avilés Pagán presentó un recurso de *mandamus* ante el TPI. En específico, solicitó al Tribunal que la Autoridad de los Puertos suspenda de inmediato las operaciones de regasificación en los muelles A y B del Puerto de San Juan y que, en un término no mayor de treinta (30) días, emita una determinación sobre la procedencia de rescindir el contrato A-029-2018 o, en su defecto, imponer las penalidades correspondientes. Peticionó, además, que PREPA rescinda el contrato de suministro de gas suscrito en 2019 con NFE por incumplimiento material, se abstenga de formalizar el acuerdo multianual de quince (15) años de duración y colabore con el NEPR y el 3PPO en el diseño de un modelo contractual de transición.

Asimismo, reclamó que el NEPR ejerza su facultad regulatoria para revisar retroactivamente y declarar nulo el referido contrato de 2019; que la AAPP y el 3PPO cancelen el RFP publicado en abril de 2025 y convoquen un proceso interino competitivo; y que la AAFAF emita una determinación expresa sobre la incompatibilidad fiscal del contrato propuesto con el plan fiscal vigente de PREPA. Finalmente, solicitó al foro primario que la Gobernadora de Puerto Rico y la Secretaria de Justicia, por conducto de la Oficina de Asuntos Monopolísticos, inicien una investigación formal contra NFE por presunta consolidación monopólica y examinen posibles actos de colusión administrativa en la adjudicación de contratos.

Tras varios trámites procesales, el TPI desestimó la *Demanda* al concluir que la secuencia de los hechos y sus resultados eran incompatibles con el recurso de *mandamus*. Determinó que los contratos suscritos por las agencias en años anteriores no podían impugnarse mediante dicho mecanismo, pues el remedio adecuado era la sentencia declaratoria contemplada en la Regla 59 de Procedimiento Civil, *supra*. Añadió que los procesos de licitación más recientes tampoco justificaban la intervención por *mandamus*, ya que aún se encontraban en distintas fases administrativas. Coincidimos con el foro *a quo*.

Conforme adelantáramos en los acápites anteriores, el recurso de *mandamus* procede únicamente para ordenar el cumplimiento de un deber ministerial claro, específico y no discrecional, cuando no exista otro remedio legal disponible. Acevedo Vilá v. Aponte Hernández, *supra*, págs. 454-455. Mientras, la sentencia declaratoria aplica cuando lo que se busca es definir o aclarar derechos y relaciones jurídicas frente a un peligro real o inminente de controversia futura, incluso en ausencia de una lesión consumada. Romero Barceló v. E.L.A., *supra*, pág. 475; Beltrán Cintrón v. E.L.A., supra, pág. 109.

Tras un análisis exhaustivo del expediente ante nuestra consideración, incluyendo la *Demanda*, el *Memorando* y la *Sentencia* aquí apelada, hemos arribado a la conclusión de que el TPI actuó correctamente

al desestimar la petición presentada por el Lcdo. Avilés Pagán. Nos explicamos.

En el caso de autos, el Apelante recurrió al mecanismo de *mandamus* con el objetivo de que varias agencias gubernamentales fueran compelidas a actuar de determinada manera para alterar la situación existente en torno al suministro y manejo del gas natural licuado; es decir, para dejar sin efecto contratos ya otorgados. En su *Memorando,* el Lcdo. Avilés Pagán planteó que dicho recurso no debía entenderse como un remedio meramente retroactivo dirigido a invalidar actuaciones administrativas pasadas, sino como un medio para restablecer condiciones mínimas de competencia, transparencia y legalidad respecto a una infraestructura crítica, a saber, el terminal de gas natural licuado de los muelles A y B del Puerto de San Juan, convertido (según él) en una instalación esencial sin reglas de acceso abierto ni canon uniforme aplicable a terceros. Igualmente, alegó que su acción no solo buscaba corregir desviaciones jurídicas, sino evitar un daño irreparable al interés público, al patrimonio del Estado y a los principios democráticos que rigen la contratación pública.[1]

Tras analizar sus argumentos, coincidimos con el juzgador de instancia en que los contratos previamente formalizados por las agencias y corporaciones públicas concernidas no pueden ser impugnados mediante el recurso extraordinario de *mandamus*. La normativa y jurisprudencia aplicable son claras en cuanto a que este mecanismo está diseñado para compeler al cumplimiento de deberes ministeriales específicos y no para declarar la nulidad de actos administrativos ya consumados, ni revisar contratos suscritos en el pasado. Para ello, nuestro ordenamiento jurídico dispone del mecanismo de sentencia declaratoria previsto en la Regla 59 de Procedimiento Civil, *supra*, que constituye el cauce idóneo para resolver este tipo de asuntos.

---

[1] *Véase*, <u>SUMAC-TPI</u>, entrada núm. 18.

En lo que respecta a los procesos de licitación y trámites administrativos recientes, tampoco encontramos fundamentos en derecho que justifiquen la intervención por vía de *mandamus*, particularmente tratándose de procedimientos que aún se encuentran en distintas fases administrativas vigentes y que deben seguir su curso ordinario, salvo que se acredite un incumplimiento claro y patente con deber ministerial no discrecional. Del análisis de los estatutos que menciona el Apelante no hemos hallado deber ministerial alguno que justifique la concesión del remedio extraordinario del *mandamus*. De hecho, en su comparecencia, el Negociado de Energía expuso que los contratos a los que alude el Lcdo. Avilés Pagán ya fueron aprobados por dicha entidad gubernamental. Resolver lo contrario implicaría desvirtuar la naturaleza extraordinaria y discrecional del *mandamus*, transformándolo en un mecanismo ordinario de revisión, lo cual resultaría incompatible con su propia naturaleza jurídica.

**IV.**

Por los fundamentos que anteceden, los cuales hacemos formar parte integral del presente dictamen, se *confirma* la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones